I turn to the third case on the calendar, Nowicki v. Cunningham. May it please the Court, I'm Jane Myers and I represent Mr. Nowicki, who is in the audience today. This case should be reversed, the judgment of the District Court, because in this case under the standards of the ADPA, there was in fact a violation of Strickland v. Washington. In that, there is a showing of deficient performance, which is the first prong, and also a showing of prejudice. I'd like to address both of those points in order. The performance here, you know, sometimes when you get a case and when you have a client, you say, what's the essence of this case? And this is a case that when I read the record, I said the essence of this case is this case compared to all the other cases that I read on Doyle Error, which basically I read nationwide, had more Doyle Error than any case I have ever seen. And that's not being dramatic, as Mr. Sergey suggested, you know, in his brief, but it's simply being accurate. And this Doyle Error occurred not only in impeaching the defendant's own testimony, where the defendant was the only witness on his own behalf, but it also took place on the people's direct case with the two key prosecution witnesses, the detectives, where it was brought out basically as substantive evidence of this defendant's guilt. And this Doyle Error has been recognized by the Supreme Court, even in a case that was a precursor to Doyle, United States against Hale, as being an error that is very damaging and very hard to cure, if curable at all. What do you do with the prejudiced part of this broken case? I think this defendant is severely prejudiced by this, and I will tell you why. There are a number of factors that go into a determination of prejudice, and I've sort of isolated them from the various cases that I have read. And the first thing you ask yourself, you know, in seeing all these cases, is the use to which the evidence was brought. And this was not only to impeach credibility, but as I stated before— But isn't all that weighed against the force of the evidence of guilt, the persuasive force? And it— What do you do with that in this case? You don't think this was a thin case, do you? I don't think it was a thin case. I also do not think it was an overwhelming case of guilt where such serious errors would not make a difference, and I will tell you why. First of all, I mean, just to get back to all the basic things, this is, by the way, a case in which no court that has ever thought about this case has ever said that there was overwhelming proof of guilt. In fact, the Appellate Division, Second Department, which was the last state court, said that the defendant's defense was a plausible one. Secondly, we also know that this is a case that the jury had tremendous trouble deciding. It took a court over the course of four days, and even though there were readbacks, there was, in fact—it shows that they did not consider it a case that was a slam dunk. What do you do with the evidence of his saliva? The evidence of his saliva was heavily challenged at trial. There was a theory, and in fact the impeachment of Mr. Nowicki's credibility by his failure to tell the police of various other possible sources of the saliva hurt him very much. It was contested because there was an alternative theory that this saliva was planted. Was planted? Was planted, perhaps by the children's father. That was the theory throughout this. And the impeachment of my client's credibility by saying, oh, you never spoke about this before, actually diminished any possibility that the jury could consider that a source of reasonable doubt. When you consider that along with the fact—and I'm not saying there's some terrible reason for this—these boys were quite young, and so you don't expect the testimony that you would expect from a grown adult. But their testimony was contradictory— But you've got saliva evidence. You've got saliva evidence and his statement that I did this. Right. If you believe the statement and the jury had Mr. Nowicki's testimony as to why that statement should not have been believed. And so there were contradictions between the child witnesses. And, of course, the younger child witness had, in fact, contradicted himself on a number of occasions, even going so far at one point as to exculpate Mr. Nowicki from the crime. That is the substance of our argument. If there are particular—I mean, perhaps I will add on a few things, because you do need to think about the ways in which prejudice was so obvious in this particular case. I mean, they used it for every purpose. They stressed it—and I did not stress this enough in my brief, but I want to stress it now—that on summation, the prosecutor said—and this is on page 2487 of the confidential appendix— Look, here's what the story is. This guy knew he was being accused of a heinous crime, which is, of course, the truth. Now, don't you think if he were an innocent person that what he'd be doing is explaining each and everything to the defendant? So they're using his silence to the police, even in the summation, to hurt him. There was no cure. There was no objection and there was no cure. These typical ways in which you can cure small errors on behalf of small doyle errors have nothing to do with this kind of case, where it's simply replete with doyle errors. And if there are no further questions, I will rest on my brief for the remainder of the argument until rebuttal. Thank you. Mr. Sergi? Yes, Your Honor. Will you please the court? My name is John Sergi. I'm an assistant district attorney for Westchester County, and I appear on behalf of the Attorneys. The reply brief that was submitted by Ms. Myers trumpets repeatedly that Nowicki's case is controlled by this court's leading decision in Casamento, leading doyle decision in Casamento. She says that that's what controls the case. An important fact, the court knows that what controls the case is Strickland and Premo in terms of the omission. She has to show that no competent attorney in the year 2000 could have done otherwise than to come up with Casamento, read it the way she read it, and object and have no tactical reason for objecting, for not doing that. She has to also show, of course, a reasonable probability of an acquittal, and she has to get by the deference to the state court in rejecting both those claims, both the state trial court and the state appellate court. Let's take a step back and look at that. Her brief did not have, her principal brief did not have Casamento on it. It did not have mention even of Anderson v. Charles. We have a highly competent attorney who is not doing what she is charging Mr. Mangiolotti with doing in the middle of trial, in spite of the fact that she has access to computer assistance and researching issues and all the rest of that. I don't think that Casamento can be read as the petitioner says. I'm sorry? Go ahead. Judge? No one said anything. Oh, okay. I thought I heard something. Also, Anderson was not mentioned in her main brief, and now she's saying, well, Anderson has to be read on its own facts. It has to be a very specific inconsistency between the two versions, and it has to be on a subject matter that the defendant was interrogated about. That's because Anderson happened to have those things in it. That's not how Anderson gets read. If you look at the cases that we did in our exhaustive review of the state of the law among the circuits in the year 2000, the courts talk about arguably inconsistent statements. They talk about material omissions from those statements. Clearly, reading that law, an attorney of ordinary competence, of any competence, would have said, well, these kind of questions asked by the prosecution in this case were permissible. Above all, Savage. Now, finally, in the reply brief, counsel agrees that Savage is controlling the New York State law case. But Savage also ruled, the New York Court of Appeals also ruled, on the heels of just after Anderson v. Charles was decided, this is not a Doyle situation. Material inconsistencies can be inquired about. Doyle does not apply, and counsel now agrees with that. How could Mr. Mangiolotti not have seen that case and not have said to himself, there's no objection here? Here, we had contradiction. We couldn't have had more complete contradiction. We had the police officers coming in and saying, the defendant said, well, I was so wasted, I really don't remember what happened. I can't tell you what happened. I remember hitting the floor and that was it. But we have the police officers coming in and saying, from the circumstances, it's absolutely possible that I did this to the boys. And then the police officers testify, two different detectives, that there came a point in time when the defendant was nervously pacing back and forth and admitted, I did this to the boys. I did it to the boys. And said later on, I regret that I've done so much to F up their lives. Then we have the defendant coming down and saying, well, yeah, it's true up until the point that we have a signed statement that says it's absolutely possible that I did it to the boys. What I said was that it's absolutely impossible that I did it to the boys. And I never admitted anything. I cooperated with the police, but everything I said was totally exculpatory. You can't have more contradiction than that. I want to read you a quote, if I can. What does Doyle tell us? Doyle tells us that when you try to develop an omission from the trial version as compared to the Mirandai's defendant's version to the police, you are trying to show a recent fabrication. But you can't do it because it's entirely possible that the defendant was simply invoking his Fifth Amendment right to silence. You don't know. The words they used were insolubly ambiguous. And it may be nothing more than an invocation of the right to silence. But Doyle's dispositive ruling was footnoted, footnote 11 in Doyle. And it says, it goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events, as here, and claims to have told the police the same version upon arrest, as here. In that situation, the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. So we know that Doyle is to be applied when there is a reasonable possibility of an invocation for silence. There was no reasonable possibility here. This man spoke freely and openly and tried to tell the jury that I did cooperate with the police. I just never said anything inculpatory. I never touched the boys, is what I told him. I think you can't have a clear contradiction between the two versions of that. And I think when that happens, when a defendant does that, he cannot raise Doyle up a flagpole and say, well, you can't ask me any questions about what was said. I think it opens up completely what was said and what was not said in the course of that police interview. On the issue of prejudice, the case was enormous. You cannot say in the context of this case, in this procedural posture before this case, that the DNA evidence was weak as the counsel attempts to do so. That's fully litigated. It's gone. It's out of the case by now. And the claims that were made, and you'll see them in our brief. We did a footnote as to some of the claims that were made. They conceded that Mr. Nowicki's DNA was on the sample. They just claimed that there was another person as well besides Mr. Nowicki, some sort of contamination. But they conceded that his DNA was there. 55.9 million to one that it wasn't Mr. Nowicki. That is strong evidence. It can't be seen as anything else but strong evidence. These errors were all, these claimed errors, were all cured. Every time, Mr. Mangiolotti made a point of making clear that, hey, they had no significance to Mr. Nowicki at the point in time of the police interview on the day after the crimes. They only became significant later, when there was a DNA report that had Mr. Nowicki's DNA on it, on the boy's genitals. Then it became significant. He stood around and he said, well, how could I say it got there besides by a criminal event? Ah, the platoon. And that became relevant at that point in time. And he also made clear that Mr. Nowicki's claim was that the whole idea of an intruder being in the house never came up, became significant to him, until he saw the, actually I was going to say read the grand jury testimony of the boys, but he actually saw a videotape of the grand jury testimony of the boys. And at that point in time, he believes, to his mind, that the boy's description of his hair as fuzzy or floppy was not an accurate description of him. Ah, intruder. And that one of the boys supposedly said that he heard a strange voice say, turn on the light. And he views strange as not including him, a stranger to the household, because the boy heard his voice before him. If you go to the summation, which is now being addressed by, ah, counsel for the first time, you will see that there are three, and only three, instances of arguable duality of comments. One appears at page 3262 of the transcript. The prosecutor stated, if there are problems with the parents, he would have told the police that he had problems with the parents. But then she agrees that it's all moot, because he said, he testified, there were no problems with the parents. The other one, the second one, it appears at page 3275 to 76 of the transcript. She says that, I asked Mr. Nowicki, she says that Mr. Nowicki initially testified that Peter forced him back into the house when he saw him about to drive the car, in the car while it was running. And I said, why didn't you tell the police that? He says it was inconsequential, he responded that it was inconsequential. But then, this was mooted by the fact that Mr. Nowicki came off his claim that he was forced back into the household. He was merely urged back into the household. And this is not an omission claim below to the district court, so it's not properly before this court. This is not one of the instances in which it was alleged to the district court that Mr. Mangiolotti should have objected. Thank you, Mr. Sergei. And we'll hear from Ms. Myers. Would you reserve some time? Thank you, Your Honor. I'd just like to make something clear about the reply brief. The reply brief for how Mr. Sergei is, Assistant DA Sergei, is explaining it has exactly flip-flopped the point of the reply brief. The reply brief's point is that the controlling law is whether there is a violation of Strickland under the rubric of the EDPA, not whether or not the state of the issue underlying the Strickland violation, namely Doyle, had to be clearly established at the time of the trial. So he's simply wrong on that. And obviously the reason we did not discuss Anderson v. Charles is this is not an Anderson v. Charles case. And while Mr. Sergei would like this court to adopt the approach that Doyle, which was in fact close to a total silence case, is what the law is, this court's leading case, which is Casamento versus United States or United States against Casamento, does not interpret Doyle that way. It's an 887 F second, and it is completely on point with this case. If there are no further questions, I will rely both on my brief and my reply brief. Thank you very much. We'll reserve the decision.